## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Lashon Terrel Hollman,

                Petitioner,      Case 16-cv-13057

v.                             Judith E. Levy
                                 United States District Judge

Jeffrey Woods,

                               Mag. Judge David R. Grand

                Respondent.

_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS [1] AND GRANTING IN PART A CERTIFICATE OF APPEALABILITY

Petitioner Lashon Terrel Hollman filed a petition for the writ of habeas corpus under 28 U.S.C. § 2254. He challenges his convictions for first-degree murder, torture, and carrying a dangerous weapon with unlawful intent. Hollman raises three claims in his petition: (1) it was objectively unreasonable for the state courts to conclude that his involuntary statement to the police did not contribute to his convictions, (2) his confrontation rights were violated by the state's failure to produce Quamay Henne for trial and by the admission of Henne's prior testimony,

and (3) his trial attorney was ineffective for not objecting to the failure to produce Henne at trial.

## I.    <u>Background</u>

Hollman was charged in Saginaw County, Michigan, with premeditated murder, Mich. Comp. Laws § 750.316(1)(a); felony murder, § 750.316(1)(b); torture, Mich. Comp. Laws § 750.85; and carrying a dangerous weapon with unlawful intent, Mich. Comp. Laws § 750.226. (Dkt. 6-18 at 1.) The Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review. 28 U.S.C. § 2254(e)(1); *see Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009).

> Sometime between January 31 and February 2, 2012, Cassandra Nelson was killed in her apartment. She was stabbed 54 times in the back and neck. Her body also had slicing wounds on one cheek and on the hands. Nelson appeared to have been struck on the head with a television.

> Defendant [Hollman] lived with his mother next door to Nelson and had gone with Nelson on January 30, 2012, when Nelson purchased a new smart phone with a slide-out keypad. Later that day, defendant's friend, Quamay Henne, witnessed defendant purchase a handful of Xanax pills from a woman who came to defendant's house. Afterward, Henne's girlfriend, Candice Parish, and her mother, Cynthia Parish, gave Henne and defendant a ride to Cynthia's apartment. Both Henne and defendant were high and drunk. Cynthia told

Candice that the two men had to leave. Cynthia drove defendant to his house around midnight.

Shortly after midnight and before 1:00 a.m. on the morning of Tuesday, January 31, Nelson told her friend, Margaret Torres, that she needed $20 to help an acquaintance avoid going to prison.[1] Torres refused. Around noon, Torres sent Nelson a text message and received no response. Torres attempted to call Nelson at 8:00 p.m. that evening and received a recorded message that the phone was either turned off or the number had been changed.

That same evening, defendant, Henne, Candice, and Cynthia, gathered at Cynthia's home. Cynthia stated that defendant "looked like he saw a ghost." Defendant privately told Henne that he had "got into it with somebody or whatever and I did some bullshit." Henne testified, "He told me that umm—that shit—he went to umm this chick house the chick was all drunk or high or some shit, started chasing him through the house, shit and he turned around, shit stabbed or something, whatever he said." Henne then indicated that defendant told him that he "stabbed the shit out of her." After this conversation, Cynthia overheard them talking about someone being killed. Also, Henne and Candice noticed that defendant had a cell phone with a slide-out key pad. When they saw him with it, defendant said that he "shouldn't have it," and that he should take the battery out. Candice also testified that defendant showed her scratches on his arm and told her he had gotten into a fight with a girl the night before.

---

[1] Defendant had outstanding fines in Isabella County and went to pay them on Wednesday, February 1, 2012. Defendant was on probation at the time. The prosecution's theory was that defendant had asked Nelson for the money to pay these fines to avoid violating the terms of his probation.

Torres continued trying to contact Nelson and went to Nelson's apartment to check on her on Thursday, February 2, 2012. She knew Nelson took Xanax for seizures and was concerned that she might have had a seizure and been injured.[2] When Nelson did not respond, Torres called the police. Officers then discovered Nelson's body face down, clothed only from the waist up, with a large amount of blood around her. They also observed a television on the floor close to her head. Investigators found pillows, quilts, and a stuffed animal in Nelson's bedroom soaked with blood, indicating that Nelson had been lying on top of these items bleeding for some time. Investigators also observed "impact splatter" on the bedroom walls, indicating that a bloody object had been struck with some amount of force. Investigators discovered several bloody footprints, which were later identified as prints from a Nike "Swoosh" sneaker.[3] Investigators discovered a breadknife and a black-handled steak knife both covered in blood. A single Budweiser beer can was also found at the scene. Investigators could not locate Nelson's cell phone, her Bridge Card, or any Xanax pills in her apartment. Later DNA testing revealed that defendant was the sole source of DNA on the beer can and a likely source of male DNA on the handle of the breadknife. The DNA of Lionell Beckom, the other primary suspect in the case, was not found on any of the items tested by the crime lab.

---

[2] Joe Grigg, an investigator with the Saginaw County prosecutor's office, later confirmed through an electronic database that Nelson had been prescribed Xanax and that she had last had her prescription filled on January 24, 2012.

[3] The prints matched the size and style of shoes later discovered in defendant's house, but forensic analyst David Bicigo stated that the shoes found in defendant's house had different "mold characteristics" and so were likely not the same shoes that made the impressions.

Detectives Joseph Grigg and Ryan Oberle interviewed defendant on February 6, 2012, and asked him to come back the next day. Defendant did not appear for his second interview. When Cynthia Parish heard that Nelson had been killed, she called the police and told them about the conversation she had overheard. Cynthia, Candice, and Henne gave statements to the police on February 7, 2012. Based on these statements, and the fact that defendant had not showed up for his second interview, defendant was located and brought to the police station for questioning.

At the beginning of the second interview, defendant was given his *Miranda* warnings and agreed to waive them and talk to the police. After the detectives told defendant that they knew he had killed Nelson, defendant stated, "I didn't do nothin'. No I did not, I want a lawyer. I really do, I want a lawyer, because you just told me what I did and I didn't do nothin'. I want a lawyer." The detectives then began photographing defendant's hands and defendant voluntarily told the detectives about his various injuries. Detective Grigg then said, "Lashon, you asked for an attorney and that's fine, you can get an attorney. If you don't wanna talk to us anymore, that's fine." Defendant responded, "but I told you I wanted to go home, you're telling me I did something that I didn't do." Detective Grigg then stated, "Well you know, you told [Quamay Henne] what you did," and "You even told the girl how you got the scratches." Defendant denied this, and Detective Grigg asked, "So they're lying?" Detective Grigg then stated, "LaShon, this is—this is the way it is. If you want an attorney and you wanna tell me that you're done talkin' to me right now, I'm gonna walk out that room, that's fine . . . . But, I'm gonna tell you this, [Henne] came down here and he told us what you told him." Detective Grigg told defendant, "you said, 'Quamay man, I fucked up. I killed that girl. I stabbed her.' Exactly what you told him." Defendant denied saying this, and Detective Grigg began questioning defendant

about whether Henne was with defendant "when it happened."

The questioning continued, and the detectives eventually informed defendant that he was not going to be released and that he would go to jail after the interrogation was over. Defendant asked, "How can I go to jail?" to which Detective Oberle responded, "LaShon, because you haven't been honest with me . . . ." Defendant asked how long he would "have to sit in jail, pending for the investigation," and Detective Grigg answered, "Might be tonight, might be tomorrow, might be the rest of your life." The detectives began handcuffing defendant and defendant said, "He said I could finish talking to him." Detective Grigg then said, "What, you don't want a lawyer now?" Defendant stated, "Can I please call my mom right now, I'll keep talking to you, I don't want a lawyer, I'll keep talking to you. I will keep talking to you, can you please just let me call my mom right now?"

Detective Oberle then told defendant that he was "100% positive" that defendant had killed Nelson and he only wanted to find out how it happened. Detective Oberle told defendant that he "had nothing to lose by telling the truth" and that he was "not tricking" defendant. Detective Oberle continued questioning defendant, and eventually defendant stated that he was at Nelson's apartment when she was killed. Defendant denied involvement in the murder, and stated that Lionell Beckom was the person who stabbed Nelson.

(Dkt. 6-18 at 1–4 (footnotes in original and footnote four omitted).)

According to the transcripts of Hollman's interview with Detectives Grigg and Oberle, Hollman stated that he and "LB" were at the victim's house on the night in question and that he went home for about fifteen

minutes to get some cigarettes. (Dkt. 6-2 at 114–16.) When he returned to the victim's home, he saw "LB" with a knife and the victim lying on the floor. (*Id.* at 116.) Then LB ran away with a trash bag (*id.* at 120), and Hollman held the victim until she passed away. (*Id.* at 115–16.) He claimed that he did not call the police because he was afraid of being implicated in the murder. (*See id.* at 115, 117.)

At trial,

> [d]efendant moved to suppress his statements, arguing that the police continued to interrogate him after he unequivocally requested a lawyer, in violation of his constitutional rights under *Edwards v. Arizona,* 451 U.S. 477, 101 S Ct 1880, 68 L Ed 378 (1981). The trial court suppressed a portion of the February 6, 2012 interview and a portion of the February 8, 2012 interview. It reasoned that the statements made after defendant stated that "he does not want a lawyer and will keep talking" should not be suppressed because they were made after waiving his right to an attorney. In closing argument, the prosecution argued that defendant's story was a fabrication and that the more reasonable explanation was that defendant himself had killed Nelson.

(Dkt. 6-18 at 4.) And in the defense's closing argument, Hollman's defense was that, at most, he was merely present during the incident and that Henne could have committed the crime. (*E.g.*, Dkt. 6-15 at 21.)

The jury found Hollman guilty on all counts, and he was sentenced to concurrent terms of life imprisonment for the murder conviction, twenty-five to thirty-five years in prison for the torture conviction, and three to five years in prison for the weapons conviction. (Dkt. 6-18 at 1, 13.) The trial court merged the two life sentences for the single murder, noting that the conviction was for one count of first-degree murder, supported by two theories: premeditated murder and felony murder. (Dkt. 6-17 at 5; Dkt. 6-18 at 13.)

Hollman appealed his convictions, raising the same claims that he presents in his habeas petition, and the Michigan Court of Appeals adjudicated those claims on the merits and affirmed his convictions. (Dkt. 6-18 at 1, 7, 9–10.) On May 28, 2015, the Michigan Supreme Court summarily denied leave to appeal. *People v. Hollman*, 497 Mich. 1028 (2015). On August 23, 2016, he filed his habeas petition corpus petition through counsel. (Dkt. 1.)

## II. **Legal Standard**

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") limits the authority of a district court to grant habeas relief on a claim that was adjudicated on the merits by the state courts. *See* § 2254(d). A §

2254 petition may only be granted if the state-court adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or the state-court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

Under § 2254(d)(1), a state-court decision is "contrary to" clearly established law "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Moore v. Mitchell*, 708 F.3d 760, 774 (6th Cir. 2013) (citing *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)).

And a state court's decision is an unreasonable application of federal law "where 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the [petitioner's] case.'" *Carter v. Bogan*, 900 F.3d 754, 767 (6th Cir. 2018) (alteration in original) (quoting *Williams*, 529 U.S. at 413). An "unreasonable application" under § 2254(d)(1) is

more than incorrect; it must be "objectively unreasonable," *id.* at 768 (citing *Renico v. Lett*, 559 U.S. 766, 773 (2010)), meaning "the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). A § 2254 petition should be denied if it is within the "realm of possibility that a fairminded jurist" could find the state-court decision was reasonable. *See Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016).

### III. Analysis

#### A. Petitioner's Custodial Statements

Hollman raises two challenges regarding the state court's treatment of his statements made in custody. First, he alleges that the state court's determination that the jury verdict could stand because the admission of Hollman's statements was harmless error, even though the admission of the statements violated his right to counsel, was objectively unreasonable. (Dkt. 1 at 2–3.) Second, Hollman argues that the state court made an objectively unreasonable factual determination that he confessed to being present during the murder. (Dkt. 1-1 at 29–30.)

Hollman does not show that either the state-court adjudication or factual finding was unreasonable.

### i. Harmless Error

As a preliminary matter, the Michigan Court of Appeals' determination that the state trial court's error was harmless is at issue here. The court concluded that the detectives violated Hollman's constitutional rights by continuing to interrogate him after he unequivocally requested counsel, that he did not make an effective post-assertion waiver of his right to counsel, and that the state trial court erred in not suppressing all of Hollman's statements after he requested counsel. (Dkt 6-18 at 5–7.) However, the Michigan Court of Appeals went on to find the error was harmless given the other evidence against Hollman. (*Id.* at 7.) Therefore, this is the focus of the Court's habeas review under § 2254(d)(1).

On habeas review, harmless error is analyzed under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which requires the constitutional "violation to have a 'substantial and injurious effect or influence in determining the jury's verdict.'" *McCarley v. Kelly*, 801 F.3d 652, 665 (6th Cir. 2015) (quoting *Brecht*, 507 U.S. at 637); *Fry v. Pliler*, 551 U.S. 112,

121–22 (2007). To find a violation had a substantial and injurious effect, a federal court must "assess the prejudicial impact of constitutional error in a state-court criminal trial." *Fry*, 551 U.S. 121. "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is . . . whether the error itself had substantial influence. If so, *or if one is left in grave doubt,* the conviction cannot stand." *McCarley*, 801 F.3d at 665 (emphasis in original) (quoting *O'Neal v. McAninch*, 513 U.S. 438, 436 (1995)).

Here, Hollman does not meet the *Brecht* standard for two reasons. First, the statements were not improperly treated as a confession, which have powerful probative value, *see Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (holding that confessions to crimes are "the most probative and damaging evidence that can be admitted against [a defendant]" (quoting *Cruz v. New York*, 481 U.S. 186, 195 (1987)). At most, the statements were a confession to being at the scene of the crime because Hollman expressly denied murdering Nelson. A confession to merely being at the scene of the crime is not afforded the same probative value as a confession to committing the crime.

Second, there was ample circumstantial evidence supporting the same conclusions that Hollman's statements supported: that he was at the scene of the crime the night Nelson was murdered and he lied about his involvement in the incident. Hollman's DNA on the beer can, the DNA on the knife,[1] Parish's testimony that she dropped him off that night at home, the scratches on his arm that he attributed to fighting with a girl, and the phone call Torres received from Nelson regarding a man needing money to pay fines and Hollman's county records showing he had unpaid fines all suggest that Hollman was at the scene of the crime that night. And there is other evidence that Hollman lied about his involvement in the murder—he lied to Torres. Torres testified that she asked him if he had seen Nelson recently, and he said he had not seen her in months. (Dkt. 6-11 at 17.) In fact, he was observed with the victim in the cell phone store on the day before the murder. (Dkt. 6-13 at 26.)

Moreover, there was evidence that implicated Hollman or cast doubt on his story in ways that the custodial statements did not. He confessed to stabbing Nelson to Henne, whose testimony was properly

_____

[1] Hollman argues that the DNA results of sample on the knife was only able to reveal that Hollman and any of his male relatives were matches. (Dkt. 1-1 at 31.) However, there is no evidence that any of those relatives were involved in this crime.

admitted. *Infra* Section III.B. Hollman claimed that "LB" committed the murder, but there was no DNA at the scene of the crime for Lionell Beckom. Cynthia Parish and Henne both stated that Hollman was high on Xanax that night, and Nelson had recently filled a prescription for Xanax, which was missing when they found her body. Her cell phone was also missing, and Candice Parish and Henne testified that Hollman had the phone after Nelson's murder. Parish also testified that Hollman stated that he should not have the phone or should take the battery out of it. Given the other evidence that performed the same functions as his custodial statements and the other evidence implicating Hollman, the Court does not have grave doubt that the verdict was substantially and injuriously affected. Therefore, he is not entitled to habeas relief on this claim.

### ii. *Unreasonable factual determination*

Hollman also contends that the state court made an unreasonable factual determination when it declared that his custodial "statement [could] only be viewed as a confession that he was at the scene of the crime at the time it happened." (Dkt. 6-18 at 6.) He is not entitled to relief on this claim.

To show that a factual determination was unreasonable under §
2254(d)(2), a petitioner must rebut the state court's factual findings with
"clear and convincing evidence" and show that those findings "do not have
support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir.
2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)).
"Equally important, 'it is not enough for the petitioner to show *some*
unreasonable determination of fact; [additionally], the petitioner must
show that the resulting state-court decision was "based on" that
unreasonable determination.'" *Carter*, 900 F.3d at 768 (alteration and
emphasis in original) (quoting *Rice v. White*, 660 F.3d 242, 250 (6th Cir.
2011)).

Here, Hollman shows that there was some unreasonable factual
determination, but he does not show that the state court's decision was
"based on" that unreasonable determination. Hollman did not admit to
being present when Nelson was stabbed. The transcript of the interview
demonstrates that he told the detectives that he left the Nelson's home
to get cigarettes, and when he returned she had been stabbed. Therefore,
the state court made an unreasonable factual determination.

Nonetheless, Hollman does not show that the state-court determination was based on its erroneous factual finding, or put otherwise, that the finding affected the state court's determination that the admission of the custodial statements was harmless. When it found that the admission of the custodial statements, whatever they may be, was harmless error, the state appellate court essentially found that the statements made no difference to the jury verdict because other evidence supported the verdict. Therefore, the state court did not base its decision on the erroneous factual finding—it did the opposite. And the harmlessness determination, an adjudication on the merits, *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015), is entitled to AEDPA deference and subject to *Brecht*. *See supra* Section III.A.i. Hollman is not entitled to habeas relief on this claim.

## B. The Failure to Produce Henne for Trial

Hollman also argues that the state appellate court's determination that his Confrontation Clause rights were not violated was unreasonable. Specifically, he argues that the state court unreasonably concluded that the prosecution exercised due diligence in trying to produce Henne for

trial and that Henne was unavailable.[2] (*See* Dkt. 1-1 at 32–39.) Both arguments fail.

The Sixth Amendment of the United States Constitution guarantees defendants in criminal cases the right to be confronted with the witnesses against them. U.S. Const. amend. VI. The Sixth Amendment "includes the right to cross-examine witnesses." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). Generally, testimonial statements of individuals who are absent from trial are admissible only if the declarant is unavailable and the defendant had a prior opportunity to cross-examine him. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The term "testimonial" applies to prior testimony at a preliminary hearing, *id.*, and a witness is unavailable for purposes of the Confrontation Clause if "the prosecutorial authorities have made a good-faith effort to obtain [the

---

[2] Although Hollman appears to characterize this claim as one under §§ 2254(d)(1) and (d)(2) (Dkt. 1-1 at 41–43), he is not attacking the facts from the evidentiary hearing. *See McMullan v. Booker*, 761 F.3d 662, 671 (6th Cir. 2014) ("Factual issues are 'basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators.'" (quoting *Thompson v. Keohane*, 516 U.S. 99, 110 (1995)). Rather, Hollman is attacking the legal determination that those facts show the prosecution made a good faith effort and exercised due diligence in trying to secure Henne's presence at trial. Ultimately, this is a mixed question of fact and law that is reviewed under § 2254(d)(1). *See Sumner v. Mata*, 455 U.S. 591, 597 (1982) (preceding § 2254); *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004). Accordingly, the Court construes this claim only as one under § 2254(d)(1).

witness's] presence at trial." *Barber v. Page*, 390 U.S. 719, 724–25 (1968). Henne's preliminary hearing testimony was admissible because the prosecution made a good-faith effort to secure his presence at trial and the defense had an opportunity to cross-examine him.

First, the state court did not unreasonably conclude that Henne was unavailable because the prosecution made good-faith efforts to ensure his presence at trial and he was unwilling to testify. The trial court held an evidentiary hearing during Petitioner's trial to determine whether the prosecution had exercised due diligence in trying to produce Henne for trial:

> Joseph Grigg stated that he found out on February 20, 2013, that Henne had been released from prison and was out on parole. Grigg faxed Henne's parole officer a subpoena, which the parole officer agreed to serve on Henne. Grigg made phone contact with Henne on March 5, 2013, and offered to arrange for Henne to travel to Michigan by plane, train, or bus. Henne told Grigg he would like to travel by train. Henne expressed concern that he would have a hard time traveling because he did not have any ID. Grigg told him to contact the Missouri Department of Corrections to see if he could get some type of ID. Grigg spoke to Henne again on March 11, 2013, and Henne still had not obtained ID. Henne also told Grigg that he was getting word through social media that he should not return to Michigan to testify. Grigg explained that defendant's mother had told Henne it would be best for her son if he did not testify. Henne told Grigg that he had been threatened and was concerned for his own safety. Grigg and

Christi Lopez, the office manager for the Saginaw County prosecutor, eventually arranged for Henne to travel by train on March 19, 2013. Henne told Grigg and Lopez that he had been unable to get on the train because he did not have a ticket and did not have ID. Lopez testified that Henne had told her he had a prison ID, but that Amtrak would not accept it. When Grigg spoke to Henne that day, he reminded him that he had been subpoenaed and that there may be a warrant issued for his arrest for failing to appear. Grigg told Henne that he could arrange for him to travel to Michigan by bus and return to Missouri the next day. Henne agreed.

Later that day, Grigg and prosecutor Paul Fehrman spoke to Henne on the phone about getting a bus ticket. According to Grigg, Henne hung up after two minutes, and that was the last they heard from him.

(Dkt. 6-18 at 7–8 (footnotes omitted).) This is sufficient to show good faith and due diligence.

The prosecution took exhaustive steps to bring Henne to trial. Shy of driving hours to physically pick him up, there was not much else the prosecution could do other than facilitate the logistics, keep in contact with him, pay for his travel expenses, and offer him protection. Critically,

it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising. And, more to the point, the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies

19

additional steps that might have been taken. Under AEDPA, if the state-court decision was reasonable, it cannot be disturbed.

*Hardy v. Cross*, 565 U.S. 65, 71–72 (2011) (internal citation omitted). The Michigan Court of Appeals' determination that the prosecution had shown due diligence was reasonable.

The cases that Hollman offers are unpersuasive. First, he only offers Michigan precedent (Dkt. 1-1 at 34–39), rather than clearly established law as set forth by the Supreme Court. Second, the cases are inapplicable because each case addresses the prosecution's lack of due diligence in locating the witness within a reasonable amount of time. *E.g.*, *People v. Bean*, 457 Mich. 677, 689–90 (1998); *People v. Dye*, 431 Mich. 58, 78 (1988). But here, the prosecution knew Henne's location and they were in regular contact with him a month in advance of trial. The prosecution simply could not make him travel to Michigan.

Hollman also argues that the prosecution dragged its feet to secure Henne's presence because it knew that it would have taken two months to arrange Henne's travel when he was in prison (Dkt. 6-7 at 4), but that reality never came to pass. The evidentiary hearing revealed that Henne was on parole, and there was no indication that thirty days was then an

insufficient amount of time to plan his travel. Therefore, the state appellate court's determination that the state trial court was correct to find the prosecution had exercised due diligence was reasonable.

Hollman also had a prior opportunity to confront Henne at Hollman's preliminary examination. And Hollman's former attorney not only had an opportunity to cross-examine Henne, he did so. (Dkt. 6-3 at 28–38.) Therefore, the state court did not unreasonably admit the testimony from the preliminary examination. For these reasons, the Michigan Court of Appeals did not unreasonably apply Supreme Court precedent when it concluded that Henne's preliminary examination testimony was properly admitted in evidence. Hollman is not entitled to relief on this claim.

## C. Ineffective Assistance of Trial Counsel

In his third and final claim, Hollman alleges that the state appellate court unreasonably determined that his trial attorney did not perform deficiently when he did not sustain his objection to the prosecution's failure to produce Henne for trial. (Dkt. 1-1 at 44; *see also* 6-10 at 4–5; Dkt. 6-12 at 41.)

To prevail on this habeas claim, Hollman "must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Hendrix v. Palmer*, 893 F.3d 906, 921 (6th Cir. 2018) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Review of counsel's performance is highly deferential; the deficient-performance prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* (same). But failing "to make meritless objections" is not *Strickland*-deficient performance. *Conley v. Warden Chillicothe Corr. Inst.*, 505 F. App'x 501, 508 (6th Cir. 2012) (citing *Bradley v. Birkett*, 192 F. App'x 468, 475 (6th Cir. 2006)). And when AEDPA and *Strickland* standards "apply in tandem" the review is "doubly" deferential. *Richter*, 562 U.S. at 105 (internal and end citations omitted) ("The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.").

Hollman's claim does not survive *Strickland* deference, much less double deference. Counsel was not deficient for failing to maintain his objection to the prosecution's failure to produce Henne because there was

no constitutional violation. *See supra* Section III.B. Thus, the objection was meritless, and counsel had no obligation to maintain it.

Hollman contends that it was important to confront Henne with his alleged perjury, i.e. his statement that Hollman confessed to stabbing Nelson, and Henne's criminal history. (Dkt. 1 at 4–5; Dkt. 1-1 at 38.) But because there was no Confrontation Clause violation, this argument is moot. Even so, defense counsel addressed this concern. He drafted a jury instruction which noted Henne's prior convictions, allowing the jury to assess his credibility, which was read to the jury after Henne's testimony was played in the court room (Dkt. 6-13 at 18) and during the charge to the jury. (Dkt. 6-15 at 25.) Thus, the jurors had a basis for evaluating Henne's credibility, despite his absence. For these reasons, Hollman is not entitled to relief on his ineffective-assistance-of-counsel claim.

## IV.   <u>Certificate of Appealability</u>

Federal Rule of Appellate Procedure 22(b)(1) provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253, and Rule 11(a) of the Rules Governing Section 2254 Cases requires the Court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To

obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right, § 2253(c)(2), which is satisfied only if reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented deserve encouragement to proceed further, *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000).

Reasonable jurists could debate the Court's assessment of Hollman's first claim regarding the harmlessness of admitting his statements to the police detectives. However, reasonable jurists could not debate the Court's assessment of Hollman's second and third claims.

## V.   Conclusion

For the reasons set forth above, the state appellate court's adjudication of Hollman's claims was not contrary to clearly established Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable application of the facts. Additionally, reasonable jurists could debate the Court's assessment of Hollman's first claim.

Accordingly, the petition for a writ of habeas corpus (Dkt. 1) is **DENIED WITH PREJUDICE** and a certificate of appealability is

**GRANTED** as to Hollman's first claim but **DENIED** as to his remaining claims.

IT IS SO ORDERED.

Dated: April 26, 2019         s/Judith E. Levy
       Ann Arbor, Michigan      JUDITH E. LEVY
                                 United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 26, 2019.

                         s/Shawna Burns
                         SHAWNA BURNS
                         Case Manager